1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

CERTAIN UNDERWRITERS AT
LLOYDS, LONDON,

     Plaintiff,

   v.

MELVIN G. ALLEN,

     Defendant.

CASE NO. C14-0945JLR

ORDER GRANTING IN PART
AND DENYING IN PART
SUMMARY JUDGMENT

## I. INTRODUCTION

16

17

18

19

20

21

22

   Before the court is Plaintiff Certain Underwriters at Lloyds, London's ("Lloyds")

motion for summary judgment and motion to strike.  (Mot. (Dkt. # 13); Mot. to Strike

(Dkt. # 21).)  This is an insurance dispute.  Lloyds moves for a declaratory judgment that

Defendant Melvin Allen's insurance claims are excluded from coverage under the

homeowner's policy Lloyds issued to Mr. Allen.  Having considered the submissions of

the parties, the balance of the record, and the relevant law, and having heard oral

1  argument, the court grants in part and denies in part Lloyds' motion for summary

2  judgment and grants Lloyds' motion to strike.

3                          **II.    BACKGROUND**

4         Lloyds issued a homeowner's insurance policy to Mr. Allen effective July 1, 2012

5  to July 1, 2013.  (Bennett Decl. (Dkt. # 14) at 3-51 ("Policy").  The policy provided

6  coverage for Mr. Allen's dwelling, personal property, and "other structures" located at

7  3925 147th Avenue NE, Lake Stevens, Washington.  (*Id.* at 3.)  The premises at that

8  address consist of Mr. Allen's house, a garage, and two sheds.  (Bennett Decl. at 53-64

9  ("Allen Dep.") at 15:6-22:21, 65-69 ("Diagrams"), 70-76 ("Photos").)  The garage is

10  attached to the house by a breezeway; the sheds are unattached.  (Allen Dep. at 15:6-

11  22:21; Diagrams; Photos.)  Mr. Allen is an auto mechanic; he operates an auto repair

12  business out of the garage.  (Allen Dep. at 9:20-10:21.)

13         The garage space is utilized as follows:  Mr. Allen stores his motorcycle collection

14  in one portion of the lower level.  (*Id.* at 24:4-5.)  That portion also contains a bathroom,

15  as well as a desk with a computer and a credit card machine.  (*Id.* at 20:9-21:1.)  Mr.

16  Allen services his auto repair customers at that desk.  (*Id.*; *see also id.* at 22:6-14.)  The

17  remainder of the lower level serves as the mechanic shop.  (*Id.* at 18:15-20:8.)  It contains

18  one hydraulic lift and one stall.  (*Id.*)  Mr. Allen also stores one hydraulic lift outside the

19  garage.  (*Id.*)  Above the repair shop sits Mr. Allen's office and machine shop.  (*Id.* at

20  19:7-11.)

21         Mr. Allen built the portion of the garage that currently houses his motorcycle

22  collection in 1974.  (*Id.* at 15:6-21.)  In 1983, in order to accommodate his burgeoning

1   auto mechanic business, he built an addition that expanded the garage to its current size.

2   (*Id.* at 17:2-18:2.)  The back wall of the original structure now forms an interior wall; Mr.

3   Allen installed a door in the wall to allow access between the original and renovated

4   sectors.  (*Id.* at 17:7-8:14; 27:8-28:7; Diagrams.)

5       In December, 2012, a fire occurred in the garage, damaging the garage and

6   adjacent dwelling.  (Bennett Decl. at 52, 66-68; Griffith Decl. (Dkt. # 18) Ex. C

7   ("Assessment Rep."), Ex. D ("Consulting Rep.").)  Mr. Allen has submitted a claim for

8   damage caused to both his dwelling and the portion of the garage consisting of the

9   original 1974 structure.  (*See* Griffith Decl. Ex. A ("Repair Estimate").)  Lloyds claims

10  that it has already paid uncontested amounts for the actual cash value amount of loss to

11  the dwelling, cleaning of personal property, and loss of use.  (Mot.; Griffith Decl. Ex. B

12  ("Cleaning Invoice").)  However, Lloyds contends that the following claimed losses are

13  uncovered:  (1) damage to the garage, (2) costs caused by enforcement of ordinances or

14  laws regulating repair of the dwelling, and (3) increased costs for handling asbestos

15  contamination.  (Compl. (Dkt. # 1).)  Lloyds seeks a declaratory judgment regarding

16  those losses. (*See id.*)  Lloyds also asks the court to declare that Mr. Allen's appraisal

17  demand is premature.  (*See id.*)

18      Mr. Allen filed his answer to Lloyds' complaint nine months late.  (Ans. (Dkt.

19  # 15).)  In his answer, he seeks to raise six counterclaims and eight affirmative defenses.

20  (*Id.*)  Lloyds has moved for summary judgment on all of its claims.  (Mot.)  Lloyds has

21  also moved to strike Mr. Allen's counterclaims and affirmative defenses as untimely.

22  (Mot. to Strike.)  Lloyds' motions are now before the court.

ORDER- 3

# III.   ANALYSIS

## A.   Legal Standard

The Declaratory Judgment Act states: "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  Lloyds seeks a declaration pursuant to this act that certain losses are not covered under the homeowner's insurance policy it issued to Mr. Allen.  A federal court sitting in diversity applies the substantive law of the forum state, but federal procedural law.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1939).  Accordingly, the parties agree that Washington State insurance law governs the parties' controversy.  *See Erwin v. Cotter Health Centers*, 167 P.3d 1112, 1120 (2007) (holding, under Washington's choice of law rules, that "the presumptive local law is applied" if parties do not dispute the choice of law).

In Washington, the determination of whether coverage exists involves a burden-shifting framework.  *See McDonald v. State Farm Fire & Cas. Co.*, 837 P.2d 1000, 1003-04 (Wash. 1992).  The insured bears the initial burden to demonstrate that the loss falls within the scope of the policy's insured losses.  *See id.*  If the insured makes that demonstration, the insurer can avoid coverage by showing that specific policy language excludes the loss.  *See id.* at 1004.  Exclusions from coverage are strictly construed against the insurer because they are contrary to the protective purpose of insurance.  *Stuart v. Am. States Ins. Co.*, 953 P.3d 462, 464 (Wash. 1998).  If the insurer shows that an exclusion applies, the burden shifts back to the insured to demonstrate that the loss fits

1    within an exception to the exclusion.  *See MKB Constructors v. Am. Zurich Ins. Co.*, No.

2    C13-0611JLR, 2014 WL 4792034, at *16 (W.D. Wash. Sept. 25, 2014); *Mid-Continent*

3    *Cas. Co. v. Titan Const. Corp.*, No. 05-CV-1240 MJP, 2009 WL 1587215, at *5 (W.D.

4    Wash. June 5, 2009).

5           The interpretation of an insurance policy is a question of law for the court.

6    *Overton v. Consolidated Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002).  Insurance policies are

7    contracts, so policy terms are interpreted according to basic contract principles.  *Id.*

8    Policies must be "considered as a whole" and "given a fair, reasonable, and sensible

9    construction as would be given to the contract by the average person purchasing

10   insurance."  *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 122 (Wash.

11   2000).  If the language is clear, the court must enforce the policy as written and may not

12   create ambiguity where none exists.  *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d

13   733, 737 (Wash.  2005).  A clause is only considered ambiguous if it is susceptible to two

14   or more reasonable interpretations.  *Id.*  If an ambiguity exists, the clause is construed in

15   favor of the insured.  *Id.*  However, if the language of an insurance policy is clear and

16   unambiguous, the court must enforce it as written and may not create ambiguity where

17   none exists.  *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.*, 951 P.2d 250, 256

18   (Wash. 1998).  However, "the expectations of the insured cannot override the plain

19   language of the contract."  *Quadrant Corp.*, 110 P.3d at 737.

20   **B.    Mechanic Shop**

21          The parties dispute whether damage to the garage is covered by the policy.  The

22   policy covers Mr. Allen's dwelling, "including structures attached to the dwelling."

1  (Policy at 8.)  The policy also covers "other structures" that are "set apart from the

2  dwelling by clear space."  (*Id*.)  The policy, however, includes the following exclusion,

3  signed by Mr. Allen:

> 4  The coverage afforded by this policy does not apply to the ownership,
>    maintenance, use, or existence of the following described building located
> 5  on the property insured hereunder:

6  <u>Description of Building</u>

7  XX Mechanic Shop

8  (Policy at 51 (Specified Outbuilding/Other Structure Exclusion Endorsement).)

9       Coverage, therefore, turns on the interpretation of the term "mechanic shop."

10 Lloyds contends that the phrase refers to the garage, which Mr. Allen uses as a mechanic

11 shop.  (Mot. at 5-7.)  Mr. Allen contends the phrase is ambiguous because there are two

12 possible interpretations:  (1) the phrase refers only to structures "unconnected" to the

13 dwelling, such the sheds or the auto lift Mr. Allen keeps outside the garage, and (2) the

14 phrase refers only to the portion of the garage that Mr. Allen actually uses as a mechanic

15 shop.  (*See* Resp. at 8-14.)  With respect to his second interpretation, Mr. Allen

16 distinguishes between the portion of the garage that corresponds to the original 1974

17 building (where he stores his motorcycle collection and computer desk) and the 1983

18 addition (where the lift, bay, office, and machine shop are located).

19       Lloyds has the better of the argument.  The exclusion applies specifically to a

20 "building."  (Policy at 51 ("The coverage . . . does not apply . . . to the following

21 described building. . . . Described Building:  Mechanic Shop."))  Courts interpret

22 insurance contracts as an average insurance purchaser would understand them and give

undefined terms in these contracts their "plain, ordinary, and popular" meaning. *Kish v. Ins. Co. of N. Am.*, 883 P.2d 308, 311-12 (Wash. 1994) (referring to Webster's dictionary to ascertain the plain and ordinary meaning of the word "flood"). The plain and ordinary meaning of the word "building" is "a structure with walls and a roof." *See* Merriam-Webster's Collegiate Dictionary (11th ed. 2003); Black's Law Dictionary (10th ed. 2014) ("A structure with walls and a roof, esp. a permanent structure."). It is undisputed that, in 2012, the original 1974 garage and the 1983 addition constituted a single structure with walls and a roof. (*Id.* at 17:7-8:14; 27:8-28:7.) Mr. Allen's proposed interpretations, however, would encompass only a portion of that building (certain rooms within the building), or, alternatively, only equipment located outside of that building. If the exclusion was intended to refer to a subpart of a building, it could easily have done so. (*See Webster's Third New International Dictionary* 1165 ("Room: a space within a building enclosed by walls or separated from other similar spaces by walls or partitions part of the inside of a building that is divided from other areas by walls and a door and that has its own floor and ceiling."); *The American Heritage Dictionary*, (5th. Ed. 2011) ("Room: . . . An area separated by walls or partitions from other similar parts of the structure or building in which it is located.")). Instead, the exclusion referred to an entire building. (*See* Policy at 51.) Mr. Allen's interpretation that "building" means only a "part of a building" does not comport with the plain language of the exclusion.

The court finds that the only sensible construction of the exclusion is that it applied to the building on Mr. Allen's premises that functioned as a mechanic shop. *See Weyerhaeuser Co.*, 15 P.3d at 122; *Kish*, 883 P.2d at 312 (holding that an ambiguity

1    exists only "if the language on its face is fairly susceptible to two different but reasonable

2    interpretations.".)  It is undisputed that, when Mr. Allen purchased the policy in 2012,

3    the only building on his premises that fit that description was the garage.  (*See* Allen Dep.

4    at 9:20-10:21.)  There is no support in the policy language for Mr. Allen's contention that

5    he is entitled to excise a portion of the garage from the exclusion on the basis that it

6    happens to serve a dual purpose, or that it fit the definition of a separate building 30 years

7    ago.  (*See* Policy at 51; *id.* at 20:9-21:1, 22:6-14.)  Therefore, the court grants Lloyds'

8    motion for summary judgment.  The court holds that the "Specified Outbuilding/Other

9    Structure Exclusion Endorsement" in the policy applies to the entire garage.

10   **C.     Code Compliance**

11          The parties dispute whether the policy covers the cost of repairs necessary to meet

12   building codes.  The parties agree that, in general, the policy excludes the cost of

13   compliance with ordinances and laws, unless specifically provided otherwise under the

14   policy.[1]  (*See* Mot. at 7; Resp. at 14.)  Mr. Allen raises two arguments in favor of

15   coverage.  Neither is persuasive.

16

17   _____

18          [1] Specifically, the policy provides:

19          1. We do not insure for loss caused directly or indirectly by any of the following.  Such
            loss is excluded regardless of any other cause or event contributing concurrently or in any
            sequence to the loss.

20

21          a. Ordinance or Law, meaning enforcement of any ordinance or law regulating the
            construction, repair, or demolition of a building or other structure, unless specifically
            provided under this policy.

22   (Policy at 14.)

1    First, Mr. Allen contends that the "Loss Settlement" provisions of the policy

2  specifically provide for recovery.  (Resp. at 14-15.)  The "Loss Settlement" provisions

3  explain that covered property losses to buildings are settled at "replacement cost" as

4  follows:

5    (1) . . .  we will pay the cost to repair or replace . . .  but *not more than the
        least of the following amounts*:

6

7    (a) The limit of liability under this policy that applies to the building;

8    (b) The replacement cost of that part of  the building  damaged for *like
        construction and use* on the same premises; or

9    (c) The necessary amount actually spent to repair or replace the damaged
        building.

10

(Policy at 16 (emphasis added).)

11

12    In interpreting similar policies, Washington courts have consistently held that

13  replacement costs "for like construction and use" of a structure do not include costs of

    upgrading a structure to meet building codes that it did not previously meet.  *See*

14  *Allemand v. State Farm Ins. Companies*, 248 P.3d 111, 114 (Wash. Ct. App. 2011)

15  (holding that coverage for "similar construction" did not include upgrades to comply with

16  building codes); *Dombrosky v. Farmers Ins. Co. of Wash.*, 928 P.2d 1127, 1135 (Wash.

17  Ct. App. 1996), *as amended* (Feb. 7, 1997) (holding that coverage for "equivalent

18  construction" did not include building code upgrades); *Roberts v. Allied Group Insurance

19  Co.*, 901 P.2d 317, 326 (Wash. Ct. App. 1995). (holding that coverage for "like

20  construction" did not include building code upgrades).  Therefore, the replacement costs

21  described under subsection (b) do not include costs necessary to bring a formerly

22

1  nonconforming structure into compliance with existing building codes.  (*See* Policy at

2  16.)

3      On the other hand, Washington courts interpreting similar provisions have found

4  that replacement costs in the "necessary amount actually spent to repair or replace the

5  damaged building" do include costs necessary to comply with building codes.  *See*

6  *Starczewski v. Unigard Ins. Grp.*, 810 P.2d 58, 62 (Wash. 1991).  Therefore, it appears

7  that the replacement costs described under subsection (c) could include compliance costs.

8  On that basis, Mr. Allen argues that he is automatically entitled to coverage for costs of

9  bringing his dwelling into compliance with modern building codes.  (Resp. at 16-17.)

10      Mr. Allen overlooks the fact that the Loss Settlement provisions provide that

11  Lloyds will only pay the "least of" the three definitions of replacement and repair costs

12  set forth in subsections (a), (b), and (c).  (Policy at 16.)  Therefore, to the extent the

13  "necessary amount actually spent to repair or replace the damaged building" exceeds

14  "the replacement cost of that part of the building damaged for like construction and use

15  on the same premises," Mr. Allen is entitled to receive only the latter amount.

16  Accordingly, the court holds that subsection (b) of the Loss Settlement provisions does

17  not include coverage for costs necessary to bring a formerly nonconforming structure into

18  compliance with current building codes, and to the extent the costs described under

19  subsection (b) exceed the costs described under subsection (c), Lloyds is only required to

20  pay the lesser amount.

21      Second, Mr. Allen argues that the efficient proximate cause rule nonetheless

22  precludes application of the exclusion.  "The efficient proximate cause rule operates to

ORDER- 10

1  permit coverage when an insured peril sets other excluded perils into motion which 'in an

2  unbroken sequence and connection between the act and final loss, produce the result for

3  which recovery is sought.'"  *Kish*, 883 P.2d at 311 (quoting *Graham v. Public Employees*

4  *Mut. Ins. Co.*, 656 P.2d 1077 (Wash. 1983)).  "In such a situation, the insured peril is

5  considered the proximate cause of the entire loss and the loss is covered despite the fact

6  that the other perils contributing to the loss were excluded." *Id.*

7          The efficient probable cause rule is inapplicable to the instant situation.  The rule

8  "applies only when two or more perils combine in sequence to cause a loss and a *covered*

9  *peril* is the predominant or efficient cause of the loss."  *Vision One, LLC v. Philadelphia*

10  *Indem. Ins. Co.*, 519, 276 P.3d 300, 309 (Wash. 2012); *see also Kish*, 883 P.2d at 312

11  ("When, however, the evidence shows the loss was in fact occasioned by only a single

12  cause, albeit one susceptible to various characterizations, the efficient proximate cause

13  analysis has no application.  An insured may not avoid a contractual exclusion merely by

14  affixing an additional label or separate characterization to the act or event causing the

15  loss.").  Here, there is only one cause of the loss—the fire.  The issue is not what caused

16  the losses, but rather what losses caused by the fire are recoverable.  As addressed in the

17  preceding paragraph, that issue is governed by the Loss Settlement provisions.  (*See*

18  Policy at 16.)  Accordingly, the court grants Lloyd's motion for summary judgment.

19  **D.      Asbestos**

20          The parties dispute whether the policy covers the costs of asbestos cleanup.  Mr.

21  Allen raises two arguments in favor of coverage.  Neither is persuasive.

22

1    First, Mr. Allen points out that the policy provides coverage for losses to real

2  property caused by "discharge, dispersal, seepage, migration, release, or escape of

3  pollutants unless the discharge, dispersal, seepage, migration itself is caused by a Peril

4  Insured Against under Coverage C," where "pollutant" is defined as "any solid, liquid,

5  gaseous or thermal irritant or contaminant." (Policy at 12.) "Fire" is a peril insured

6  under Coverage C. (Policy at 13.) Therefore, Mr. Allen concludes that the asbestos

7  cleanup caused by the fire damage is necessarily covered by the policy. (Resp. at 19-20.)

8    The policy, however, includes an endorsement that specifically excludes increases

9  in insured losses due to contamination of hazardous substances as defined by the United

10  States Environmental Protection Agency ("EPA"). Specifically, the endorsement

11  provides:

12      Notwithstanding any provision to the contrary within the Policy . . . the
        Policy does not insure: . . .
13
        (b) any increase in insured loss, damage, cost, or expense, . . .
14
        which arises from any kind of seepage or any kind of pollution and/or
15      contamination, or threat thereof, whether or not caused by or resulting from
        a peril insured.
16
17  (Policy at 30 ("Seepage and/or Pollution and/or Contamination Exclusion").) The

18  exclusion applies to, among other things, the "seepage of, or pollution and/or

19  contamination by, . . . any material designated as a 'hazardous substance' by the United

20  States Environmental Protection Agency." (*Id.*) Asbestos is classified by the EPA as a

21  "hazardous substance." *See* 42 U.S.C. § 9601(14); 40 CFR 401.15.

22

ORDER- 12

1    Between the two provisions, the endorsement controls.  Whereas the general

2    policy language refers to "pollutants," the exclusion applies to a subset of pollutants:

3    "hazardous substances."  (*See* Policy at 12, 30).)  In contract interpretation, specific

4    provisions are given greater weight than general language.  *Adler v. Fred Lind Manor*,

5    103 P.3d 773, 786 (Wash. 2004).  More important, the plain language of the endorsement

6    provides that it supersedes contrary provisions in the policy.  (Policy at 30); *see*

7    *Transcon. Ins. Co. v. Wash. Pub. Utils. Districts' Util. Sys.*, 760 P.2d 337, 343 (Wash. Ct.

8    App. 1988) (giving effect to an endorsement that superseded the general terms of the

9    policy).  Therefore, the policy does not cover the costs of the asbestos cleanup.

10    Second, Mr. Allen once again relies on the efficient proximate cause rule.  That

11    rule, however, is inapplicable to the instant situation.  The hazardous substances

12    exclusion applies to "*any increase in insured loss* . . . which arises from any kind of

13    seepage or any kind of pollution and/or contamination, or threat thereof, *whether or not*

14    *caused by or resulting from a peril insured*."  (Policy at 30 (emphasis added).)

15    Washington courts have found coverage where, as here, the precipitating event is itself

16    excluded from coverage by the clear terms of the insurance policy.  *See Findlay v. United*

17    *Pac. Ins. Co.*, 917 P.2d 116, 118 (Wash. 1996) (holding that the efficient proximate cause

18    rule did not foreclose application of an exclusion that defined the combination of the two

19    causes at issue as an uninsured peril); *Vision One, LLC v. Philadelphia Indem. Ins. Co.*,

20    276 P.3d 300, 309 (Wash. 2012).  Therefore, the court grants Lloyds' motion for

21    summary judgment.  The court holds that the policy does not cover the asbestos cleanup.

22

ORDER- 13

1    **E.    Appraisal**

2         Lloyds asks the court for a declaratory judgment that Mr. Allen's demand for an

3    appraisal is premature.  The policy provides:  "If you and we fail to agree on the amount

4    of loss, either may demand an appraisal of the loss."  (Policy at 17.)  At oral argument,

5    the parties' counsel confirmed that appraisal is a process is external to the court in which

6    each side picks an appraiser to assess the value of the claimed, covered losses, and a

7    neutral arbiter selected by the parties reconciles any differences between the appraisers'

8    opinions.

9         Lloyds contends that the precondition of a "failure to agree on the amount of loss"

10   has not been met.  (Mot. at 9-11.)  Mr. Allen points out that he has provided Lloyds a

11   copy of a 46-page estimate from a third party of the cost of repairs of his dwelling and the

12   garage.  (*See* Repair Estimate.)  Lloyds argues that it cannot form an opinion as to the

13   amount of loss because the report includes the cost of all damages to all structures on the

14   premises, some of which Lloyds believes are not covered.  At oral argument, however,

15   the parties' counsel agreed that their disagreement over the extent of coverage was based

16   on three issues:  the mechanic's shop exclusion, coverage for code upgrades, and

17   coverage for asbestos remediation.  The court has now ruled on each of these three issues.

18   *See supra* §§ III.B-D.  As such, the court need not reach the appraisal issue.  Lloyds'

19   arguments as to why Mr. Allen's documentation of his claims is inadequate are no longer

20   applicable.  The parties' rights regarding arbitration under the policy are unaffected by

21   this order.  (*See* Policy at 17.)  The court therefore denies Lloyds' motion for summary

22   judgment and dismisses Lloyds' appraisal claim without prejudice as moot.  *See S. Or.*

ORDER- 14

1  *Barter Fair v. Jackson Cnty., Or.*, 372 F.3d 1128, 1133-34 (9th Cir. 2004); *Gator.com*

2  *Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005); *see also Doe No. 1 v. Reed*,

3  697 F.3d 1235, 1238 (9th Cir. 2012).

4  **F.      Untimely Counterclaims and Defenses**

5         Mr. Allen refused to answer Lloyds' complaint until three months before trial.

6  (*See* Compl.; Ans.)  Only after Lloyds moved for summary judgment—and pointed out

7  that Mr. Allen had never filed an answer—did Mr. Allen decide to respond to the

8  complaint.  (*See* Mot.; Ans.)  In his answer, Mr. Allen raises for the first time six

9  counterclaims against Lloyds, namely, claims for breach of contract insurance bad faith,

10 violation of the Washington Insurance Fair Conduct Act, violation of the Washington

11 Consumer Protection Act, breach of contract, negligence, and seeking various declaratory

12 judgments.  (*See* Ans. at 6-8.)  Mr. Allen also raises for the first time eight affirmative

13 defenses.  (*See id.* at 4.)  At oral argument, Mr. Allen's counsel stated that he was not

14 prepared to proceed to trial on his counterclaims; in fact, he had not even began

15 discovery.  Yet he put forth no explanation as to why he had waited so long to bring the

16 counterclaims to the court's attention.

17        "The decision whether to permit such a belated attempt to expand a [case] lies

18 within the discretion of the district court."  *Brass v. Cnty. of L.A.*, 328 F.3d 1192, 1197

19 (9th Cir. 2003) (holding that a district court properly refused to permit the plaintiff to

20 raise new claims on the eve of trial because the plaintiff "offered no excuse or

21 justification for his failure to raise them earlier"); *Coleman v. Quaker Oats Co.*, 232 F.3d

22 1271, 1294 (9th Cir. 2000) (upholding a district court's order preventing the plaintiff

1    from proceeding on claims raised for the first time on summary judgment); *see also* Fed.

2    R. Civ. P. 12(h) ("The court may strike from a pleading an insufficient defense or any

3    redundant, immaterial, impertinent, or scandalous matter."); *Lake v. Fellner*, No. 2:12-

4    CV-01345-GMN, 2014 WL 664653, at *2 (D. Nev. Feb. 19, 2014) (striking answer filed

5    one year after the deadline to respond under Rule 12(f); *Intagio Corp. v. Tiger Oak*

6    *Publications, Inc.*, No. C 06-3592 PJH, 2007 WL 2769783, at *1 (N.D. Cal. Sept. 21,

7    2007) (same)

8            The court holds that Mr. Allen is not permitted to inject 14 new claims and

9    defenses into the case three months before trial.  For the past year, this case has

10   proceeded according to a schedule agreed upon by the parties.  (*See* JSR (both parties

11   agreeing that the case would be ready for trial by June 1, 2015).  Every major case

12   deadline, from the deadline to amend pleadings, to the discovery deadline, to the

13   dispositive motions deadline, has now passed.  (*See* Sched. Order (Dkt. # 10).)  Motions

14   in limine have been filed.  (*See* MILs (Dkt. # 22).)  Trial is looming one month away.

15   (*See* Sched. Order.)  Now, at the twelfth hour, Mr. Allen wants to reset the clock to zero,

16   and start afresh with new defenses and counterclaims.  That tactic unfairly prejudices

17   Lloyds, who has prepared this case for a year on the basis of the properly pleaded claims.

18   Mr. Allen, however, has not shown a satisfactory reason as to why he waited so long—

19   after agreeing to a trial date in June, 2015, no less—to apprise the court of his

20   counterclaims and affirmative defenses.  Therefore, the court exercises its discretion and

21   strikes Mr. Allen's untimely counterclaims and affirmative defenses.  *See Alvarado v.*

22   *FedEx Corp.*, No. C 04-0098 SI, 2007 WL 127999, at *1 (N.D. Cal. Jan. 12, 2007)

1 (striking an untimely answer because the plaintiffs would be prejudiced by the late

2 assertion of new defenses); *Brass*, 328 F.3d at 1197 ("The district court did not abuse its

3 discretion in refusing to allow [the plaintiff] thus to broaden his case.").

4                                      **IV.   CONCLUSION**

5        For the foregoing reasons, the court grants in part and denies in part Plaintiff's

6 motion for summary judgment (Dkt. # 13).  The court also grants Plaintiff's motion to

7 strike (Dkt. # 21) and strikes Defendant's counterclaims and affirmative defenses without

8 prejudice.

9        Dated this 7th day of July, 2015.

10

11

12 _____

13 JAMES L. ROBART
   United States District Judge

14

15

16

17

18

19

20

21

22

ORDER- 17